AUSA:   A. Wu/T. Haugabook     Telephone:  (313) 226-9100
AO 91 (Rev. 11/11)  Criminal Complaint    Task Force Officer:   Lance Sullivan, F.B.I.    Telephone:  (313) 965-2323

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

United States of America
  v.

Michael Sam Hurd

Case No.

Case: 2:21−mj−30209
Assigned To : Unassigned
Assign. Date : 5/4/2021
Description: U.S. V. MICHAEL SAM
HURD

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____August 23, 2020_____ _____ in the county of _____Wayne_____ in the
_____Eastern_____ District of _____Michigan_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 39A | Knowingly aimed a laser pointer at an aircraft or its flight path in the special jurisdiction of the United States |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Task Force Agent Lance Sullivan, F.B.I.
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date:  _May 4, 2021_____

_____
*Judge's signature*

City and state:  _Detroit, Michigan_____

Hon. Kimberly Altman, U.S. Magistrate Judge
*Printed name and title*

## **<u>AFFIDAVIT</u>**

I, Lance Sullivan, being first duly sworn, hereby depose and state as follows:

## I.    INTRODUCTION

1.    I am a Sergeant with the Detroit Police Department having been so employed since 1997 and have also served as a Task Force Officer (TFO) with the Federal Bureau of Investigation (FBI) in Detroit, Michigan since January of 2019. I am currently assigned to the Violent Crime Task Force in the Detroit Division of the FBI. My training and experience include participation in numerous state and federal investigations, including producing and providing analysis of numerous evidentiary videos in connection with the prosecution of narcotics trafficking, federal firearms offenses, murder for hire, and other federal criminal violations. Furthermore, I am a certified Forensic Video Technician, (LEVA) Law Enforcement & Emergency Services Video Association International, Inc. I have testified hundreds of times to assist courts regarding forensic video evidence. I have provided expert testimony in the field of Forensic Video Analysis, specifically, by assisting in the field of video production and clarification in Wayne County Circuit, 36th District Court, and in the United States District Court

for the Eastern District of Michigan.  I have over 870 classroom hours of training in audio and video forensics.

2.      The statements in this affidavit come from my personal observations, training, experience, and information obtained from other law enforcement officers and witnesses.

3.      This affidavit is intended to show that probable cause exists that MICHAEL SAM HURD (DOB XX/XX/1989) has violated Title 18 U.S.C. § 39A, Aiming a Laser Pointer at an Aircraft, and does not set forth all information known to law enforcement regarding this investigation.

4.      Title 18 U.S.C. § 39A states that "[w]hoever knowingly aims the beam of a laser pointer at an aircraft in the special aircraft jurisdiction of the United States, or at the flight path of such an aircraft, shall be fined under this title or imprisoned not more than 5 years, or both." "Special aircraft jurisdiction of the United States" is defined under Title 18 U.S.C. § 31(b) and Title 49 U.S.C. § 46501 to include "any . . . aircraft in flight" if it is an "aircraft in the United States."

## II.    PROBABLE CAUSE

5.     On August 22, 2020,[1] Affiant began working as part of a team monitoring a protest held by a group known as "Detroit Will Breathe" in the downtown area of Detroit, MI. The protest continued into the morning hours of August 23, 2020. The group held protests in Detroit from approximately May through November 2020. In the morning of August 23, 2020, the team was utilizing the Detroit Police Department (DPD) radio system. At approximately 12:30 AM, as Affiant was monitoring radio traffic, Affiant heard Commander Darin Szilagy advise DPD Air1 (a DPD helicopter) to monitor the crowd which was located on Woodward Avenue (near Clifford Avenue) from the air. Corporal Daniel Balow, the Flight Tactical Officer, advised that the helicopter was in the air above and in a position to monitor. Shortly after, Corporal Balow called out on the radio and advised that the helicopter had been struck by a laser from someone within the crowd. Corporal Balow repeated that they were struck by a laser from the ground but were "Okay."

---

[1] A previous affidavit contained a typographical error identifying the date as August 23, 2020. The protest activity began on August 22, 2020 and continued into the early hours of August 23, 2020.

6.      On August 24, 2020, Affiant met with and interviewed Corporal Balow and DPD Air1 Pilot, Sergeant Charles Richie. Both explained that on the previous night, someone in the crowd of protestors hit their helicopter with a green colored laser beam while it was in flight. In his official DPD incident report, Sergeant Richie explained, "[t]he green laser resulted in temporary momentary blindness causing the incapacitation of the flight crew." After the interviews, Affiant conducted a forensic extraction of the relevant surveillance video captured by the onboard video camera within the helicopter. The forensic extraction included a system time check and authentication of the video system.

## ACQUISTION OF ADDITIONAL AUDIO/VIDEO EVIDENCE

7.      Affiant also sought additional relevant video footage relevant to the green laser beam incident.

8.      On August 25, 2020, Affiant received surveillance video footage from Rock Security Company, located at 1074 Woodward Avenue Detroit, Michigan 48226. The videos came from cameras in numerous locations on Woodward Avenue, between Clifford and Grand River Ave, in Detroit, MI—the

area from which the green laser beam appeared to have originated.



*(Google Map with red indicator of relevant area)*

9.      From August 26 through August 31, 2020, Affiant obtained additional video and audio surveillance from multiple sources, including dispatch tapes covering the relevant times of the laser incident, Detroit Detention Center video recordings of the detainees from the protest, and Detroit Department of Transportation (DDOT) bus video from the coach which transported the detainees from the protest site to the DDC.

## AUDIO/VIDEO COMPOSITION AND ANALYSIS

10.      Affiant reviewed the audio and video evidence obtained in order to establish a timeline of the incident and identify the person responsible for hitting DPD Air1 with the green laser beam. Based on the video obtained from DPD Air1, Affiant was able to identify the intersection closest to where the laser beam appeared to originate from, specifically Woodward Avenue just south of Clifford Street in downtown Detroit. On the sidewalk along the west side of Woodward Avenue,

between Clifford Street and Grand River Avenue, Affiant observed six rectangle shaped objects which contain shrubbery (referred to in this affidavit as "flower boxes").

11. Around the time that DPD Air1 was hit by the green laser beam, DPD Air1's video depicts bright beams of light originating from the west side of Woodward between the first and second flower boxes (south of Clifford Street). Based on the timing, the description of the DPD Air1 crew, and the brightness of the light visible on the video, along with Affiant's training and experience, it appears that the bright beams of light correspond to the green laser beam that hit DPD Air1. The first sighting of the suspected laser beam was on August 23, 2020 at approximately 12:30:26 AM. The laser intermittently struck the helicopter's camera for approximately seven seconds.

 

*(DPD Air1 Camera view of suspect location)*          *(Google Map view of suspect location)*

12. The video obtained from Rock Security Company included footage

of the area from which the green laser beam appears to have originated. Specifically, the cameras from:



*(1448 Woodward, Camera Name: DET 1448 WW (The Ferguson) St. Level N. Front N View)*



*(1449 Woodward, Camera Name: DET 1449 Woodward NE Cam S View)*



*(DET 1500 WW Rooftop SW Corner PTZ View)*

13. After authenticating and synchronizing the extracted video from the

aforementioned cameras to DPD Air1's footage, Affiant observed a person (later identified as HURD) sitting on the ground against the second flower box (south of Clifford Street) shortly before DPD Air1 was hit by the green laser beam. HURD was wearing a white hard hat with goggles on the hat, a respirator, a long sleeve white shirt (with a cross on the upper left arm), a dark colored back pack on his back, a waist/thigh bag, dark colored pants, and dark colored shoes/boots. Affiant observed HURD stand up and look up into the air in the direction of DPD Air1. HURD appeared to reach into the bag affixed to his hip/leg. A light in HURD's hand then appeared to turn on momentarily. Based on Affiant's training and experience, this light may have come from a flashlight, laser, or similar illumination device.



*(Video from 1449 Woodward)*

14.     HURD then moved his hands near his waist in what appeared to be some type of manipulation of objects. Based on Affiant's review of the video

footage from the camera at 1449 Woodward Avenue, a bright light and a green haze appeared in and around HURD's hands around the time that the green laser beam hit DPD Air1. Based on Affiant's training and experience, HURD's actions and the light observed from his hands appears consistent with shining a light beam and with using a reflective surface (such as a mirror) to manipulate and direct the light beam.



*(Video from 1500 WW Rooftop SW Corner PTZ)*



*(Video from 1448 Woodward, light reflecting in and around HURD's hands)*

Around the time when DPD Air1 was hit with the green laser beam, HURD was looking upward in the direction of DPD Air1. HURD held steady with the same

posture during the period of time that the green laser beam intermittently struck DPD Air1 (approximately seven seconds). Based on Affiant's review of the video evidence, during the period of time that the green laser beam struck DPD Air1, HURD appeared to be the only person in the area from which the laser beam originated who was looking up and appeared to be manipulating a light source. During that time, an unidentified individual was observed passing HURD on the sidewalk. The individual looked at HURD as he passed him, and then looked up to the sky.



*(Video from 1449 Woodward, HURD held a still posture while pointing the laser)*

15.     Afterwards, HURD walked into the street and appeared to place an object or objects (suspected to be the laser beam device and/or reflective device) in his waist/thigh bag.

16.     At approximately 12:49 AM, Detroit Police informed the protestors that they were unlawfully assembled. After multiple warnings to disperse, the police began to detain protestors who refused to do so. The Rock Security video footage

from 1449 Woodward showed HURD remaining in the camera view as the police advanced north on Woodward towards the protestors. Numerous protestors vacated the area while others remained. Police were observed arresting several people. HURD was standing next to the second flower box (south of Clifford Street), in the same area he was in when he directed a laser beam at DPD Air1, as police interacted with an unknown person nearby. HURD was observed reaching toward the person the police were interacting with. An officer reached toward HURD and another officer removed HURD's backpack and dropped it on the sidewalk. There was a physical struggle between a police officer and HURD, and HURD fell into the flower box with another individual (who appeared to be another protestor, dressed in black, wearing a helmet with a red medic cross symbol).



*(Video from 1449 Woodward- HURD falling into flower box)*

17.     HURD was escorted onto the sidewalk and handcuffed. After HURD stood up, a large dark stain was visible on the back of the white long sleeve shirt he was wearing.



*(Video from 1449 Woodward- HURD being escorted out of flower box)*

Police then escorted HURD to a staging area on the east side of Woodward.



*(Video from 1449 Woodward- HURD being escorted to the staging area)*

An unknown person was observed picking up the backpack and walking away on the sidewalk, south on Woodward.

18.     Affiant spoke with DPD Lieutenant Brandon Cole, the commanding officer of the Mobile Field Force Unit, the unit responsible for maintaining peace during lawful assemblies. Lieutenant Cole advised that all people who were detained on August 23, 2020 were brought to staging areas, transported to 1301 Third (DPD

headquarters), and then placed on a DDOT bus to be transported to the Detroit

Detention Center (DDC).

19.     Affiant reviewed surveillance video (audio & video) from DDOT

Coach 2013, which was the bus used to transport detained protestors on August 23,

2020. The video depicts HURD entering the bus while still wearing a respirator, a

long sleeve white shirt (with what appeared to red tape creating a medic cross symbol

on the upper left arm), bag affixed to the waist/thigh, dark pants and dark

shoes/boots. Additionally, Affiant observed a large dark stain on HURD's back,

consistent with HURD being the person who fell into the flower box during the

physical struggle. After the DDOT bus arrived at the Detroit Detention Center

(DDC), Police Officer Nicole McDonald was observed entering the bus. Officer

McDonald was heard calling out the name, "Michael Hurd." HURD responded

affirmatively and stood up. Officer McDonald approached HURD and advised him

of a ticket he was receiving. Officer McDonald then placed a piece of paper in

HURD's front pants pocket and then escorted him off the bus into the Detroit

Detention Center (DDC) sally port area. Video further depicts HURD being

escorted into the Detroit Detention Center (DDC). HURD was escorted through the

processing area and out to the front lobby area. HURD removed a piece of paper

from his front pants pocket and gave it to DPD Sergeant Samuel Pionessa. Minutes

later, Sergeant Pionessa returned a piece of paper to HURD and HURD exited the Detroit Detention Center (DDC) through the front doors.

20.     Affiant interviewed Sergeant Samuel Pionessa regarding the processing of the protest arrestees. Sergeant Pionessa advised that if an arrestee had identification, he/she would have been ticketed and released, pending a $100 bond, being paid by an awaiting, unknown defense attorney. If a person did not have identification, he/she would be fingerprinted and processed.

21.     Affiant interviewed Police Officer Nicole McDonald regarding her interaction with HURD. Officer McDonald advised Affiant that HURD had an US Army Health card as identification. Officer McDonald also stated she issued three tickets to HURD in connection with his arrest.

22.     Affiant reviewed a copy of the ticket listing three violations issued to HURD by Officer McDonald. The date of birth listed for HURD was XX/XX/1989. Affiant also observed a copy of the identification that HURD provided. The identification was from the US Department of Veterans Affairs.

23.     Affiant reviewed an open source search engine and found that HURD has a Twitter account with the account name "@mediaflare." Affiant observed several posts on the @mediaflare page.

 

*(1449 Woodward, Surveillance footage)*     *(@mediaFlare-Twitter Post)*

24.     One post read, "Oh hey I finally found a decent pic of me before being rolled over by the bullies in badges. I was taken down with trans allies and had to watch them punch one of them over and over while they sat on me." The post included a picture of a person and location that Affiant recognized from review of the video footage obtained in connection with this investigation. The picture in the post appears to depict HURD at the August 22, 2020 protest, shortly before his arrest.

25.     On November 6, 2020, a federal search warrant was obtained in the Eastern District of Michigan for HURD's residence; the warrant was executed on November 19, 2020 by members of the FBI Detroit Violent Crime Task Force (VCTF). While the search was being executed, and after being advised of his Miranda rights, HURD was interviewed by members of the VCTF.

26.     During the interview, HURD told investigators that he was present

at the August 22nd protest that ended on Woodward Avenue (arrest made/citation given on August 23rd). HURD described the protest as "a march starting at the McNamara Federal building, down through, I think, it's called Spirit of Detroit park…then they were going to paint some street I've never heard of, and then head down Woodward [where the laser strike originated from] and make a break there for some music and speeches." HURD was there "as a street medic." HURD admitted that he had a laser pointer on him that night, and described it as a "black laser pointer with a green laser." HURD kept the laser with him on "the outside of my IFAK [Individual First Aid Kit]" (which appears to refer to the waist/thigh bag visible in the surveillance footage, as discussed above). HURD stated "several riot police came up and surrounded us while we were trying to move the water bottles." This appears consistent with surveillance video of HURD's arrest, where cases of water can be seen near one of the flower boxes. HURD stated he was arrested (detained) that evening (August 22nd, and cited early the next morning, August 23rd, at the Detroit Detention Center). Affiant queried Hurd's arrest and citation records, and found that the only tickets Hurd received in 2020 prior to the execution of the search warrant were issued on August 23 in connection with the protest starting on August 22. HURD further stated that "the laser itself got confiscated already" by Detroit Police that evening and was not returned. HURD had "a flashlight and a

laser pointer that sit on the outside of it [appearing to refer to the IFAK] and a glowstick." HURD stated "the IFAK made it with me to whatever jail we were at."

27.     Affiant conducted interviews with officers on scene the night of the protest to determine whether the laser had been confiscated by Detroit Police and whether it was in Detroit Police custody. The officers interviewed did not recall any property taken or confiscated from individuals arrested/ticketed that night or the next morning, however, Affiant's review of reports from other officers working other portions of the protest revealed that fifty (50) items, from various other individuals, were placed on evidence—a laser was not among those items. Affiant also spoke to Sgt. Samuel Pionessa (DDC) and Sgt. Timothy Vernon (Mobile Field Force), who were present at the DDC for the temporary housing and booking process of the detainees from the August 22 protest. Both sergeants stated the only items removed from detainees at the DDC were from detainees who did not have valid identification on their person and who were processed through the standard booking process. HURD used military medical identification and therefore was not processed in the standard booking process.

28.     Based on Affiant's investigation, it appears that the laser had not been confiscated by Detroit Police, but rather may have been lost when HURD was detained. Affiant reviewed surveillance video and officer body camera footage from

HURD's initial detainment. During a struggle with officers, a black, cylindrical item, consistent with the laser described by HURD, launched from the area of HURD's body. The black, cylindrical item can be seen rolling along the sidewalk and does not appear to be picked up during HURD's arrest by HURD or any officer.

 

*(1201Woodward)*                              *(1449 Woodward)*

Affiant and (TFO) Det. Matthew VanRaaphorst interviewed Officer Peter Padron, who was among the officers who detained HURD. Officer Padron identified himself as the officer who pulled HURD's backpack from his back. Officer Padron explained that he approached a "street medic" (later identified as HURD) and observed some kind of object affixed to his chest area. At the time, Officer Padron believed the object could be a weapon or other type of threat, and he reached out and removed it from Hurd's chest area. Officer Padron remembered throwing the object and then removing Hurd's backpack. Officer Padron stated the object was black and appear to be the same size (length) as a small folding knife. The object

may have been HURD's laser, and appears to have been left on the ground after it was thrown.

29.     When asked if he remembered a helicopter the night of the protest, HURD stated "I remember a helicopter, because there usually is one…it was definitely shining a spotlight on us at one point." When asked if he remembered shining a laser beam at the helicopter, HURD stated "not entirely…hmm, I personally don't, but I also probably shouldn't answer too many things because I'm currently tied up in a court thing about August" [which appears to refer to the tickets he received after the protest].

30.     During the interview, HURD agreed to allow investigators to search his vehicle, a 2005 Subaru Forester. HURD signed a consent to search form at that time.

31.     During the search of HURD's 2005 Subaru Forester, red tape, like the kind used to create the "medic cross" on HURD's shirt, was discovered. Also observed in the front passenger side of the vehicle were protective eye wear (goggles) and an IFAK (Individual First Aid Kit). The IFAK observed in HURD's car is pictured below, and appears to be the same waist/thigh "bag" HURD was wearing in surveillance video from August 22 and 23, 2020, and also described in his interview. The IFAK also had a flashlight and glow stick secured on the outside.



*(IFAK observed in HURD's vehicle)*

32.     Probable cause exists that MICHAEL SAM HURD knowingly aimed a laser pointer at an aircraft or its flight path in the special jurisdiction of the United States violation of Title 18 U.S.C. § 39A.

Lance Sullivan
Task Force Officer, FBI

Sworn to before me and signed in my
presence and/or by reliable electronic means.

Honorable Kimberly Altman
United States Magistrate Judge

May 4, 2021